## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| Reineri Andreu Ortega, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:25-cv-496 |
| | ) | |
| NATIONAL COLLEGIATE ATHLETIC | ) | COMPLAINT FOR |
| ASSOCIATION, | ) | INJUNCTIVE RELIEF |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR INJUNCTIVE RELIEF

1.      Plaintiff Reineri Andreu Ortega, a student and prospective college wrestler at Iowa State University brings, this action to challenge the arbitrary and capricious application of bylaw 12.6 (the "Five-Year Eligibility Clock") of Defendant, the National Collegiate Athletic Association ("NCAA"). Bylaw 12.6 generally limits the number of years that a student (like Ortega) can compete in Division I NCAA athletics. To be clear, the five-year limit itself is not at issue. Instead, it is the NCAA's determination of when Ortega's five year "clock" began running that is being challenged. As applied in Ortega's case, the NCAA's application of the Five-Year Eligibility Clock unjustifiably restrains the ability of Ortega and other college athletes to earn meaningful compensation that is now available to NCAA Division I athletes. This action seeks declaratory and injunctive relief against Defendant for a violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

## INTRODUCTION

2.      In a landmark 2021 decision (*NCAA v. Alston*, 594 U.S. 69 (2021)), a unanimous U.S. Supreme Court paved the way for college athletes[1] to receive compensation for use of their

---

[1] The lawsuit avoids using the term "student athlete" because it "is an NCAA marketing invention designed to 'conjure the nobility of amateurism,' assert 'the precedence of scholarship over

names, images, and likenesses ("NIL Compensation") due to the NCAA's violation of antitrust laws. The market realities of college sports have changed tremendously over the last forty years. For instance, from 1982 to 1984, CBS paid $16 million per year to televise the March Madness Division I men's basketball tournament. In 2016, those annual television rights brought in closer to $1.1 billion. As a result, the NCAA is no longer even arguably entitled to any "sort of judicially ordained immunity from the terms of the Sherman Act for its restraints of trade." *Id.*

3.      Reacting to the lecture it received in *Alston*, the NCAA lifted its prohibition on NCAA athletes receiving NIL Compensation on July 1, 2021.

4.      In the four years since, the market for NIL Compensation opportunities available to NCAA Division I athletes has exploded into a multi-million dollar industry. Significantly, NIL Compensation opportunities are virtually only available to NCAA Division I athletes.

5.      On June 6, 2025, a Federal Court approved a final settlement agreement between the NCAA, the Power Five Conferences[2] and a class of former NCAA student-athletes in the House v. NCAA Settlement[3], which has now paved the way for NCAA institutions to directly pay athletes through a "revenue sharing" scheme.

6.      As a result, developing athletes who compete outside of the NCAA monopoly have no meaningful opportunity earn scholarships, "revenue sharing" income and/or to profit from their name, image, or likeness (NIL) opportunities (hereafter collectively "permissible compensation").

---

athletic[s],' and 'obfuscate the nature of the legal relationship at the heart of a growing commercial enterprise.'" *Johnson v. NCAA,* 108 F.4th 163 (3rd Cir. 2024).
        [3] The NCAA Power Five Conferences are the Atlantic Coast Conference (ACC), Big Ten Conference, Big Twelve Conference, Southeastern Conference and formerly the PAC-12 Conference.
        [3] *Settlement Agreement*, *House v. Nat'l Collegiate Athletic Ass'n*, No. 4:20-cv-03919-CW (N.D. Cal. July 26, 2024). The settlement consolidated three federal antitrust class-action lawsuits against the NCAA: *House v. NCAA*, *Hubbard v. NCAA*, and *Carter v. NCAA*.

7.      The NCAA's Five-Year Eligibility Clock, as applied in this case, restricts the ability of students (like Ortega) who begin their post-high school careers at a non-NCAA institution from having the same opportunity to earn permissible compensation as students who enter NCAA institutions as freshmen.

8.      In the Plaintiff's case specifically, the NCAA's application of the Five-Year Eligibility Clock has limited his NCAA eligibility by starting his "clock" while he was attending a post-high school institution (in Cuba) which does not even offer athletics of any sort.

9.      Counting the years that a student attended an institution which is not affiliated with the NCAA as years on their NCAA eligibility "clock" is arbitrary and capricious.

10.      The Five-Year Eligibility Clock, as applied in this case, neither promotes competition nor benefits college athletes. Instead, starting the "clock" on athletes before they have enrolled at an NCAA institution to participate in athletics (in this case wrestling) stifles the competition in the labor market for NCAA Division I wrestlers, harming college athletes and degrading the quality of Division I wrestling consumed by the public.

11.      These harms are contrary to Defendant's stated mission of promoting the well-being of college athletes and are the very ills federal antitrust law seeks to remedy.

12.      Ortega, and other wrestlers (or prospective athletes in other sports) who are harmed by this illegal restraint have a small window of time to compete in Division I sports and earn the permissible compensation now available to them.

13.      Additionally, wrestling in particular does not have the same professional avenues as other college sports such as football or basketball. This leaves wrestlers with a small window of opportunity to earn permissible compensation, a window that is made even smaller by the NCAA's application of their Five-Year Eligibility Clock—starting before the student enrolls at the NCAA institution.

14.    In the case of Reineri Ortega, although he first enrolled as a student at Iowa State University in January of 2023, the NCAA has maintained that his "clock" started after he completed high school and enrolled in a post-high school institution (in Cuba) that does not even offer sports (or wrestling in particular).

15.    This application of the NCAA's Five-Year Eligibility Clock rule has effectively barred the Plaintiff from an NCAA Division I college career, and because he has limited to no professional wresting opportunities post college (as a 130 pound athlete), the harm inflicted by the NCAA's application of this rule is irreparable and ongoing, and temporary and preliminary injunctive relief is necessary.

16.    Ortega brings this action to put a stop to the unjustified anticompetitive restriction on universities who seek to compete for college athletes, and to restore freedom of economic opportunity for himself and other college athletes.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, Sections 4 and 26 of the Clayton Act, 15 U.S.C. § 26, and under 28 U.S.C. §§ 1331 and 1337.

18.    This Court may exercise personal jurisdiction over Defendant NCAA because Defendant currently transacts business in the Southern District of Iowa. Defendant and its member institutions conduct athletic competitions, ticket and merchandise sales, television agreements, and other revenue-generating activities in the Southern District of Iowa.

19.    Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. 22, and under 28 US.C. § 1391(b)(2).

## **THE PARTIES**

20.     Plaintiff Reineri Andreu Ortega is a prospective college wrestler at Iowa State University and resides in Ames, Iowa.  Plaintiff completed the equivalency of high school in Cuba in the Spring of 2016 and began taking courses at a non-NCAA institution in Cuba, which does not have a wrestling (or athletics) program, from fall of 2016 to spring of 2019. Ortega arrived in America in December of 2022 and then enrolled at Iowa State University in Spring of 2023. Ortega's Affidavit, Exhibit 4 at ¶¶ 7–10.

21.     Defendant NCAA is an unincorporated association of post-secondary institutions that acts as the governing body of college sports. The NCAA includes more than 1,100 member colleges and universities throughout the United States, including institutions in the Southern District of Iowa. These member institutions are organized into three divisions, and Division I includes over 350 schools.

22.     Through the NCAA Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports, including specifically, the Bylaw at issue in this case, Division I Bylaw 12.6. The NCAA Constitution and Bylaws were adopted by votes of the member institutions and various NCAA councils, and they may be amended by votes of the member institutions or NCAA councils. Thus, the rules set forth in the NCAA Constitution and Bylaws constitute horizontal agreements between the NCAA and its member institutions and among NCAA member institutions.

23.     As a practical matter, an academic institution that wishes to participate in the highest and most popular level of collegiate athletics must maintain membership in the NCAA and abide by the Division I rules and regulations promulgated by the NCAA and its members. Failure to abide by these rules and regulations risks subjecting sports programs at the academic institution to punitive measures from the NCAA that include reduced athletic-scholarships, suspensions,

prohibition on post-season eligibility, vacating previously earned wins, monetary fines, and the so-called "death penalty."

24.      The NCAA and its member institutions control the highest and most popular level of collegiate athletics. Therefore, any individual who wishes to provide athletic services in exchange for permissible compensation by competing at the highest level of collegiate athletics must by necessity attend an NCAA Division I member institution.

25.      There are no practical alternatives that can provide the unique combination of attributes offered by Division I NCAA athletic schools: (i) the ability to exchange athletics services for the payment of the partial or full cost of an education plus room and board, (ii) high quality academic educational services, (iii) top-of-the-line training facilities, (iv) high quality coaches, (v) national publicity through national championships and nationwide broadcasting contracts, (vi) opportunities to profit from revenue sharing and/or NIL agreements, and (vii) competition at the highest level of collegiate athletics.

## FACTUAL BACKGROUND

### I.      Colleges Governed by the NCAA.

26.      The NCAA "is a voluntary, self-governing organization of four-year colleges, universities and conferences committed to the well-being and development of student-athletes, to sound academic standards and the academic success of student-athletes, and to diversity, equity and inclusion."[4] "The NCAA, then known as the Intercollegiate Athletic Association (IAA), was founded in 1905 to regulate college football. Today, the NCAA and its members collectively issue rules that govern many aspects of athletic competitions among NCAA member schools. The NCAA comprises three Divisions. Of the NCAA's eleven hundred schools, approximately three hundred

---

[4] 2025–26 NCAA Division I Manual, attached hereto as Exhibit 2.

and fifty schools compete in Division I.  Conferences may enact and enforce conference-specific rules, but these must be consistent with the NCAA's own rules. The NCAA rules governing participation in Division I generally are enacted by the Division I Board of Directors."[5]

27.    Although the NCAA started out as a small nonprofit organization, its economic power has grown exponentially over the last 120 years. Today, "the NCAA generates approximately one billion dollars in revenues each year…. The five conferences with the largest revenues, known as the Power Five Conferences, each generate hundreds of millions of dollars in revenues per year, in addition to the money the NCAA distributes to them…. [The] SEC made more than $ 409 million in revenues from television contracts alone in 2017, with its total conference revenues exceeding $ 650 million that year[].  The revenues of the Power Five [now Power 4] have increased over time and are projected to continue to increase."[6]

28.    It is the NCAA's mission to "provide student-athletes with the opportunity to participate in sports and compete as a vital, co-curricular part of their educational experience.... The basic purpose of the Association is to support and promote healthy and safe intercollegiate athletics, including national championships, as an integral part of the education program and the student-athlete as an integral part of the student body."  2025-26 NCAA Manual. In other words, the NCAA concedes that the ability to participate in college sports is both "vital" and "integral" to the four-year college experience.

## II.    Colleges Not Governed By The NCAA

29.    In contrast to the four-year colleges governed by the NCAA, most two-year colleges

---

[5] *In re National Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litigation*, 375 F. Supp. 3d 1058, 1062 (N.D. Cal. 2019) (internal citations omitted) (invalidating other NCAA rules limiting the ability of college athletes to earn money).
[6] *Id.* at 1063.

("Junior Colleges") are governed by the National Junior College Athletic Association ("NJCAA"),[7] which has no affiliation with the NCAA. Each year, more than 60,000 student- athletes from 500 member colleges compete in 27 different junior college or "JUCO" sports.

30.    The National Association of Intercollegiate Athletics (NAIA) is comprised of 250 small four-year colleges with 20 conferences and 29 national championship sports.  Like the NCJAA, the NAIA has no affiliation with the NCAA.

31.    While the NCAA generates billions of dollars in revenue while televising nearly all Power 5 [now Power 4] conference football games, it took the NJCAA until 2022 to reach an agreement with ESPN to nationally televise just one JUCO football game (the NJCCA national championship game), with 13 additional games available through an online streaming platform.[8] To be clear, while the NJCAA streams a total of 13 games over its entire season, the NCAA televised forty football games on just one Saturday in November 2024, and televises a similar number every single week of the season (not to mention several games on other nights of the week).[9]

32.    Nationally televised NAIA contests are limited to non-existent.

33.    Most international post-high school institutions, such as the one Ortega attended in Cuba, are not governed by the NCAA and have no affiliation with the NCAA, nor an opportunity for NIL or revenue sharing compensation.  In short, playing any sport for a junior college, NAIA school, or other non-NCAA institution is not a comparable alternative to competing as a Division I College athlete in terms of exposure—either to earn permissible compensation while in college or for future career opportunities in their chosen sport.

---

[7] One hundred junior colleges in California are governed by the California Community College Athletic Association, which also has no affiliation with the NCAA.
[8] *See* 2022-23 NJCAA Annual Report at p. 18 (last viewed on November 3, 2024 at https://www.njcaa.org/about/annual_report/index).
[9] *See*, e.g. https://www.usatoday.com/story/sports/ncaaf/2024/11/02/college-football-schedule- week-10-saturday/75918275007/ (last accessed Nov. 3, 2024).

III.   **The NCAA Is Governed by Self-Created Bylaws That Discriminate Against Transferring Athletes from outside the NCAA.**

34.    Each NCAA division maintains its own bylaws, with amendments proposed by member institutions. *See* Ex. 2 at pp. 14, 17-18. Each NCAA member school is required to "hold itself accountable to support and comply with the rules and principles approved by the membership." *Id.* at p. 9. One key bylaw applicable to Division I schools is at issue in this lawsuit – NCAA Bylaw 12.6.

A.   **The Five-Year Eligibility Clock: NCAA Bylaw 12.6**

35.    Under NCAA Bylaw 12.6, an athlete has five years of eligibility to play four seasons of "intercollegiate competition" in his or her chosen sport (the "Five-Year Rule"). The athlete's five-year window is known as an "Eligibility Clock" and starts to run from the date on which an athlete registers as a full-time student at any "collegiate institution," whether or not such institution is a member of the NCAA and whether or not the athlete competes in any sport at the non-NCAA institution. Ex. 2, at p. 66, NCAA Bylaw 12.6.1.

36.    The NCAA's Guide for Two Year Transfers has a section on the Eligibility Clock, where it explains the purpose of the five- year rule is to "move student-athletes toward graduation in a timely manner." Ex. 6, NCAA Guide for Two Year Transfers 2024-25 at p. 21. In other words, the NCAA concedes the five-year rule is not designed for any pro-competitive purpose.

37.    The irrelevance of the Eligibility Clock start date to competitive balance becomes even more apparent when one realizes the five-year clock begins to run whether a student plays a sport or not. Under this Bylaw, a student, like Ortega, can attend a non- NCAA college for three years without playing any sports, take two years off from school for personal reasons, transfer to a four-year NCAA school, and the student will have used all of their eligibility without ever having competed in a college sport for a non-NCAA or NCAA college.

9

38.      In contrast, a student who graduates from high school, wrestles at a prep school for a post-grad year and then attends an NCAA school still receives five years of eligibility to play four seasons.

39.      Similarly, a student who graduates high school and becomes a professional athlete in another sport can play that other sport for years, then go to college and still have five years of eligibility to play four seasons of a sport—as long as it is a different sport than they played professionally. The NCAA rules, therefore, do not limit the ability of the former professional athlete to earn permissible compensation while competing in Division I athletics, even though they have had a chance to physically mature well beyond a typical 18-year-old college freshman. For instance, Chris Weinke entered Florida State University as a freshman following a six-year professional baseball career and ended up winning the Heisman Trophy, awarded annually to the most outstanding player in college football, at 28 years of age.[10] Accordingly, it is apparent that the Five-Year Eligibility Clock does not exist for reasons of competitive balance or it would preclude other older athletes from competing in Division 1 NCAA sports.

**B.      Application of the Eligibility Limitation Bylaw to Plaintiff Reineri Andreu Ortega**

40.      Plaintiff Renieri Andreu Ortega was born and raised in Cuba. After graduating high school in 2016 he took courses at Manuel Fajardo University from fall of 2016 to spring of 2019. While attending Manuel Fajardo University in Cuba, Ortega did not participate in any athletics as the institute does not offer any sports programs. Ortega's Affidavit, Exhibit 4 at ¶¶ 5–7.

41.      In 2017, Ortega began training and wrestling for the Cuban National Team – with no affiliation to a college or university. In December of 2022 Ortega left the Cuban National Team and came to America as a refugee. *Id.* at ¶¶ 8–9.

---

[10] *See* https://en.wikipedia.org/wiki/Chris_Weinke (last accessed on Nov. 6, 2024).

42.    Upon arriving in the United States, Ortega enrolled at Iowa State University in the Spring of 2023. Once enrolled at Iowa State Ortega was on the Iowa State wrestling team but did not compete in the 2022-23 season. *Id.* at ¶ 10.

43.    The NCAA has since denied Ortega's request to be eligible beyond the 2022-23 season due to the NCAA Bylaw 12.6.1 "Five Year Rule."[11] The NCAA relies upon the fact that Ortega was enrolled in a non-NCAA institution in Cuba, to determine that he was ineligible, even though he did not participate in any intercollegiate competition.  NCAA Appeal Decision, Exhibit 3.  The Defendant stated in their denial letter to Ortega that it was of his own choosing that he went to the University in Cuba instead of going to a college that had NCAA Division I wrestling. *Id*. Using this reasoning to determine Ortega's Eligibility Clock started in 2016 is arbitrary, has no procompetitive justification, and strips Ortega and collegiate athletes alike of an opportunity to compete in the highest realm of wrestling available and for NIL compensation.

44.    The NCAA's Five-Year Eligibility Clock violates Section 1 of the Sherman Act by restraining the market for NCAA Division I college athletes (and in this case a wrestler) by precluding Reineri Andreu Ortega and other similarly situated athletes who enrolled in non-NCAA institutions and did not participate in athletics at non-NCAA institutions from having an opportunity to earn NIL/ Revenue Sharing Compensation while competing at an NCAA Division I institution.

45.    Specifically, the current application of the Five-Year Eligibility Clock violates the Sherman Act by starting an athlete's Eligibility Clock while the athlete is attending a non-NCAA institution regardless of whether the athlete, like Ortega, participated in athletics while at the non-NCAA institution—thereby limiting if not eliminating the athlete's ability to earn NIL/Revenue Sharing compensation.

---

[11]  The NCAA's appeal decision is attached hereto as Exhibit 3.

46.    The 2020 Covid Extension exacerbated the problem by creating opportunities for NCAA Division I athletes to extend the number of seasons in which they could compete in Division I athletics and earn NIL/Revenue Sharing compensation without providing the same opportunities to transfer students. Without the application of the Five-Year Rule there would be tremendous demand amongst NCAA institutions seeking to compete for the services of the Plaintiff and similarly situated athletes.

### C.    The "Rule of Restitution": NCAA Bylaw 12.9.4.2

47.    If the Court grants Ortega injunctive relief, it must also address NCAA Bylaw 12.9.4.2, commonly known as the "Rule of Restitution," which provides:

> If a student-athlete who is ineligible under the terms of the bylaws or other legislation of the Association is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative against the institution attended by such student-athlete or against the Association, or both, and said injunction is voluntarily vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified, the Board of Directors may take any one or more of the following actions against such institution in the interest of restitution and fairness to competing institutions . . .

Ex. 2 at 65-66, NCAA Bylaw 12.9.4.2. Potential punishments under the Rule of Restitution include vacating wins, postseason bans, return of television revenue, and financial penalties, among others. *Id.* To make a temporary restraining order and preliminary injunction meaningful in this case, Ortega respectfully requests the Court enjoin the NCAA's application of the Rule of Restitution against Ortega, Iowa State University, and any other NCAA Division I college to which Ortega could transfer because the Rule's "purpose is to punish challenges to the NCAA's anticompetitive rules by attempting to deprive courts of the ability to grant effective relief and depriving individual student-athletes and member institutions of the practical ability to rely on court orders in their favor." *State of Ohio*, 706 F.Supp.3d at 601.

12

## **RELEVANT MARKETS**

48.     The Five-Year Eligibility Clock affects one labor market: the market for Division I athletes.  Within this market, prospective college athletes like Ortega compete for roster spots on Division I athletic teams and those NCAA Division I colleges compete against each other to recruit the best college athletes to compete on their athletic teams.  Transfer students (from both within and outside of the NCAA) and other non-traditional students (like the Plaintiff) are increasingly an important subgroup of the student-athlete population.

49.     The relevant geographic market is the United States.  The NCAA and its member institutions are located across the country, and they engage in on-field (or on-mat) competition and competition in the relevant labor markets throughout the United States.

50.     There are no alternatives to the permissible compensation opportunities or other benefits college athletes (here wrestlers) receive from participating in NCAA Division I sports.  The opportunity to showcase athletic skills at the highest level of amateur athletic competition while pursuing a college degree from an NCAA Division I institution makes participation in this market unique.

51.     Within this market, the NCAA and its member institutions maintain exclusive market power, with the sole ability to dictate the rules and regulations for participation in Division I athletics.

52.     The transactions in which the NCAA and its member institutions engage in this market with college athletes are commercial in nature, as they significantly affect the present and future earning potential of college athletes and yield significant financial revenue for the member institutions from the sizable consumer interest in college athletics.

53.     Under the recent *House v. NCAA* settlement (hereafter "House Settlement") NCAA member institutions are now allowed to directly pay NCAA athletes under a revenue sharing

arrangement.

54.     There are a limited number of NCAA Division I wrestling programs that will receive an allocation of House Settlement revenue sharing proceeds for their wrestlers—with Iowa State University being one of them.

55.     The House Settlement further provides for NCAA athletes to continue to be eligible to receive compensation (in addition to revenue sharing) from NIL opportunities.

56.     As a practical matter, NIL opportunities are only available to college athletes competing at NCAA Division I institutions.

57.     Although the NCAA is a non-profit organization, the transactions member institutions make with college athletes yield significant financial revenue for the member institutions and have significant effects on the future earning potential of those college athletes.

58.     In particular, these transactions include scholarships (and now revenue sharing under the House Settlement) in exchange for the college athlete's services. The college athletes, in return, receive the means to develop, refine, and showcase their skills—essential inputs to their future earning potential. NCAA athletic events in which these college athletes compete are marketed to consumers who view both in-person and via broadcasts of these sporting events, yielding significant revenue to the NCAA's member institutions and conferences.

59.     Accordingly, the transactions between these member institutions and the college athletes are inherently commercial in nature and fall under the purview of the Sherman Act.

## ANTICOMPETITIVE EFFECTS

60.     The NCAA enacts and enforces rules that it claims promote the well-being of college athletes and preserve the amateurism aspect of Division I college sports. The NCAA and its member institutions adopt these rules through the member institutions and the Division I Council, making these rules equivalent to horizontal agreements among the NCAA and its member

institutions who compete against one another for the labor of Division I college athletes.

61.    Starting a Student's Five-Year Eligibility Clock at any time before the student enrolls at an NCAA institution to compete in athletics restrains college athletes from improving their economic opportunity, personal growth, and well-being with permissible compensation, through a full four-year college playing experience. This restriction violates the Sherman Act because it has direct anticompetitive effects that harm college athletes and consumers of college athletics.

62.    The NCAA's current application of the Five-Year Eligibility Clock limits the amount of time athletes may compete in Division I athletics because they have chosen to attend a non-NCAA institution prior to enrolling at a Division I NCAA college. These same restrictions are not placed on athletes who choose to delay entry to a Division I NCAA college to attend prep school, serve in the military, partake in a religious mission, or even to compete professionally in another sport.

63.    Starting the NCAA's Five-Year Eligibility Clock before a student enrolls at an NCAA institution to compete in athletics harms athletes by limiting their years of NCAA competition during which they would otherwise be eligible for permissible compensation.

64.    This premature "clock start" has an even greater impact upon wrestlers (like the Plaintiff).   Unlike football, basketball or baseball, wrestling does not have the professional avenue that the other sports do, therefore arbitrarily limiting NCAA eligibility for wrestlers can have an even more profound impact upon their career earnings potential from wrestling.

65.    The NCAA frequently touts the benefits of competing in college athletics for college athletes, especially for college athletes who will not move on to professional athletics. *See, e.g.*, *The Value of College Sports*, NCAA, https://www.ncaa.org/sports/2014/1/3/the-value-of-college-sports.aspx (accessed Nov. 3, 2024) (the value of college sports includes unparalleled exposure  and experiences through "the opportunity to travel across the country and around the world

for regular- season contests, NCAA championships and foreign tours" which "can open doors for the few who will compete professionally and for the majority who will go pro in something other than sports.").

66.    Accordingly, the lost opportunity that results from a pre-mature and/or arbitrary start of an athlete's "eligibility clock" by the NCAAA results in not only losses of economic opportunities (permissible compensation) but also the intangible benefits of "exposure and experiences" which the NCAA prides itself upon—resulting in immeasurable and irreparable harm to college athletes like Ortega.

## NEGATIVE IMPACT ON CONSUMERS

67.    The NCAA's current application of their Five-Year Eligibility Clock causes negative downstream effects on nationwide consumers who follow college wrestling by either attending competitions and/or watching on television.

68.    When athletes are prevented from competing simply because they previously attended a non-NCAA institution, the value of the product that the NCAA provides to consumers is diminished.

69.    The quality of college wrestlers and wrestling programs in general is less competitive when athletes' eligibility is limited by the pre-mature starting of the Five-Year Eligibility Clock.

## LACK OF PROCOMPETITIVE JUSTIFICATION

### I.    There is No Procompetitive Justification for the Five-Year Eligibility Clock.

70.    Because the above demonstrates the anti-competitive effect of the Five-Year Eligibility Clock on the Division I labor market for wrestlers, like Ortega, and the consumer market for persons watching college wrestling, the burden shifts to the NCAA to prove a procompetitive justification for the Five-Year Eligibility Clock.

16

71.    Based on its historical arguments, the NCAA may offer two potential justifications for the Five-Year Eligibility Clock. First, the NCAA may argue the Five-Year Eligibility Clock promotes the academic well-being of college athletes. Second, the NCAA may argue the Five-Year Eligibility Clock preserves the amateurism model of the NCAA. Both arguments are pretextual.

72.    In guidance to college athletes on the transfer process, the NCAA has stated that its Eligibility Clock is "designed to move student-athletes toward graduation in a timely manner." Ex. 6, 2024-25 NCAA Guide for Two Year Transfers at p. 21.   However, starting a non-NCAA transfer or athlete's Eligibility Clock years before the athlete arrives on the NCAA member institution's campus does nothing to help an athlete earn his degree.

73.    The NCAA does not mandate how many transfer credits from a non-NCAA college that each member institution must accept.  Indeed, non-NCAA transfers to elite academic schools may have few acceptable transfer credits, forcing them to take classes over again and necessitating more semesters of school to earn a degree than the two or three years of eligibility the NCAA allows them to play.  *See* Aldridge, D., "*Do Baseball Community College Transfers Have a Fair Shot*" at pp. 1-16.

74.    In the instant case, Ortega attended a post-high school institution in Cuba (again which did not offer wrestling or any sports)—earning credits which *may* transfer towards a bachelor's degree at Iowa State University (most likely as electives).  However, starting his Eligibility Clock at the start of his enrollment at a part-time academic institution in Cuba does nothing to advance the NCAA's mission for promoting education.

75.    In light of the recent landmark decisions in *NCAA v. Alston*, and more recently the *House v. NCAA* settlement which authorizes revenue sharing with athletes, the "amateurism model" argument is dead.  *See NCAA v. Alston,* 594 U.S. 69 (2021).

76.    Even assuming the "amateurism" argument could still be made with a straight face,

17

unless an athlete competed professionally in a particular sport BEFORE attending college, preventing them from competing in NCAA athletics solely because they decided to start their post-high school education at a non- NCAA institution has zero relationship with their "amateur status". Any NCAA arguments to the contrary are pretextual and do not justify such anticompetitive restrictions.

## II.    Any Potential Procompetitive Justifications for the Eligibility Limitation Bylaws Could Be Accomplished by Less Restrictive Means

77.    Even if the academic and amateurism goals of the NCAA were valid procompetitive justifications (and they are not), both goals could be accomplished through less restrictive alternatives, some of which are already in place within the NCAA bylaws.  For example, NCAA Bylaws already require college athletes to maintain progress toward degrees to be eligible to compete in NCAA events. *See* NCAA Bylaw 14.4.1. Other NCAA Bylaws require minimum credit hour and grade point averages for college athletes to be eligible for competition. These bylaws related to academic progress, GPA, and in-season transfers accomplish the NCAA's academic goals without the unjustified restrictions imposed by the Five-Year Eligibility Clock.

78.    Additionally, minor revisions to the Five-Year Eligibility Clock could maintain any procompetitive intent by the NCAA without damaging athletes who may have attended a non-NCAA institution prior to their enrollment to compete for an NCAA school. In particular, the start of the Eligibility Clock in Bylaw 12.6.1 and 12.6.1.1 could be triggered based on when the athlete first registered for classes at "an **NCAA member** institution" instead of when they register at a "**collegiate** institution" as in the current bylaws.  Thus, procompetitive justifications for the Five-Year Eligibility Clock can be accomplished through less restrictive alternatives.

**COUNT I OF COMPLAINT:**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT: FIVE-YEAR ELIGIBILITY**
**CLOCK.**

79.    Ortega repeats and realleges each allegation set forth in the preceding paragraphs as if fully set forth herein.

80.    Defendant NCAA, by and through its officers, directors, employees, agents or other representatives, and its member institutions have entered an illegal agreement to restrain and suppress competition in the relevant markets through the adoption and enforcement of the Five-Year Eligibility Clock: NCAA Bylaws 12.6 (the Five-Year Rule).  Specifically, the NCAA and NCAA member institutions have agreed to unlawfully restrain the ability of Division I college athletes who transfer to the NCAA from a non-NCAA institution to play for the same number of years offered to every other college athlete.  The restraint imposed by the Five-Year Eligibility Clock cannot withstand analysis under the rule of reason.

81.    The market for athletic services in Division I athletics (in this case wrestling) is the relevant antitrust market. The transactions between NCAA member institutions and college athletes in this market are commercial in nature and fall under the purview of the Sherman Act.

82.    This unlawful agreement among horizontal competitors has unreasonably restrained competition among schools for the college athletes competing in the relevant markets, as colleges are prohibited from retaining the services of a certain "transfers" from outside of the NCAA, like Ortega, for the four or five years they are permitted to retain the services of other college athletes.

83.    This limitation prevents such athletes from realizing the benefits of competing in NCAA Division I sports for the same length of time available to all others, harming their current and future earning potential and careers.

84.    As a direct result of Defendant's conduct, athletes seeking to enroll in or transfer to

an NCAA Division I college have suffered and continue to suffer an antitrust injury due to the reduction in competition among Division I schools for college athletes through the restrictions imposed by the application of the Five-Year Eligibility Clock.

85.    Starting the Five-Year Eligibility Clock BEFORE a student enrolls in an NCAA institution to compete in a particular sport, yields few, if any, benefits to competition to the NCAA's member institutions, athletes, or consumers. Moreover, any such benefits are far outweighed by the harm to competition and to the athletes subject to the current restrictive application of the Clock rule—which could be easily modified to address such concerns by starting the clock the semester the student enrolls in an NCAA school and competes in the sport.

86.    Defendant's conduct is ongoing and will continue to impose injury on current and former non-NCAA athletes, attendees and consumers of college wrestling unless injunctive relief is granted. This ongoing harm caused by the NCAA's current application of the Five-Year Eligibility Clock has caused, and continues to cause, direct harm to Plaintiff Reineri Andreu Ortega by restricting his ability to compete in NCAA Division I college wrestling and earn permissible compensation —and does so as an unreasonable restraint on the labor market.

87.    Defendant and its member institutions' anticompetitive acts were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce.

88.    Ortega is seeking a temporary restraining order, preliminary injunction, and permanent injunction enjoining Defendant from continuing to violate Section 1 of the Sherman Act by enforcing NCAA Bylaws 12.6, as to Ortega, and from enforcing NCAA Bylaw 12.9.4.2 to punish Ortega, Iowa State University, and any other NCAA member institution for actions taken in compliance with any orders from this Court. Ortega also asks the Court to explicitly rule that his eligibility clock started when he enrolled at Iowa State University in spring of 2023 (with the

20

intention of competing in wrestling prior to an injury)[12] and therefore is entitled to compete in Division I college wrestling in the 2025–26, and 2026–27 school year.

## PRAYER FOR RELIEF

WHEREFORE, Ortega respectfully requests that this Court:

1. Adjudge and decree that Defendant's enforcement of NCAA Bylaw 12.6, violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

2. Enter a permanent injunction, in a form that the Court deems just and proper, pursuant to 15 U.S.C. § 26, enjoining Defendant from continuing to violate Section 1 of the Sherman Act by enforcing NCAA Bylaws 12.6, as to Ortega, and from enforcing NCAA Bylaw 12.9.4.2 to punish Ortega, Iowa State University, and any other NCAA member institution for actions taken in compliance with any orders from this Court;

3. Award Ortega by setting his "Eligibility Clock" at the start of his enrollment at Iowa State University/ Spring of 2023, therefore allowing Ortega eligibility in the 25–26 and 26–27 college wrestling seasons to avoid harm caused by NCAA Bylaws 12.6;

4. Adjudge and decree that Defendant's enforcement of the competition limitations in the NCAA Bylaws 12.6. violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

5. Award Plaintiff Ortega his costs, including reasonable attorneys' fees; and

6. Order any other relief that this Court deems just and proper.

---

[13] For purposes of this action, Plaintiff is conceding that his initial enrollment at ISU (Spring of 2023) was with the intention of wrestling for Iowa State and thus Spring of 2023 would be an appropriate starting point for his Five-Year Eligibility Clock.

**RESPECTFULLY SUBMITTED BY:**        **HARTUNG & SCHROEDER**

    /s/ J. D. Hartung
J.D. Hartung    AT0003359
Hartung & Schroeder
303 Locust Street, Ste. 300
Des Moines, IA  50309
(515) 282-7800
(515) 282-8700 (FAX)
ATTORNEYS FOR PLAINTIFF

/s/ Michael A. Dee
Michael A. Dee, AT0002043
Dakota J. Farquhar, AT0015734
BROWN, WINICK, GRAVES,
GROSS AND BASKERVILLE, P.L.C.
666 Grand Avenue, Suite 2000
Des Moines, IA 50309-2510
Telephone:  515-242-2451
Facsimile:  515-283-0231
E-mail: Michael.Dee@brownwinick.com
E-mail: Dakota.Farquhar@brownwinick.com