IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| REINERI ANDREU ORTEGA,<br><br>  Plaintiff,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br><br>  Defendant. | **No. 4:25-cv-00496-RGE-SBJ**<br><br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

## I.    INTRODUCTION

Plaintiff Reineri Andreu Ortega renews his motion for preliminary injunction against Defendant the National Collegiate Athletic Association. Ortega seeks to prevent the NCAA from applying the five-year eligibility clock in a manner which would prevent him from competing in the 2026 and 2027 Division I wrestling seasons at Iowa State University or another NCAA member institution. Ortega further seeks to prevent the NCAA from applying the rule of restitution to penalize Ortega or any NCAA member institution.

For the reasons set forth below, the Court denies Ortega's motion for a preliminary injunction.

## II.    BACKGROUND

### A.    Factual Background

The limited purpose of a preliminary injunction is "to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "[H]aste . . . is often necessary if those positions are to be preserved." *Id.* As a result, the Court's decision to grant or deny an injunction rests on "procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* Accordingly, the Court's findings

of fact and conclusions of law in this Order are not binding at trial. *See id.*

Ortega is a twenty-eight-year-old wrestler from Cuba. Vaughn Decl. ¶ 36, ECF No. 43-1. Ortega enrolled in Manuel Fajardo, a Cuban university, in 2016. Ortega Decl. ¶¶ 7–8, ECF No. 34-2. Ortega began training with and wrestling for the Cuban national team in 2017. *Id.* ¶ 9. Throughout his time at Manuel Fajardo, Ortega competed in wrestling tournaments. *See* Hr'g Mins., ECF No. 66. Ortega came to the United States in 2022 to be a training partner with the Iowa State wrestling program. Ortega Decl., ECF No. 34-2 ¶ 10. The NCAA granted Ortega two eligibility waivers—the "Athletics Activity Waiver and the Extension of Eligibility Waiver." Vaughn Decl., ECF No. 43-1 ¶¶ 37–43. The first waiver was granted because Ortega competed in the 2020 Pan American Wrestling Olympic Qualification Tournament, and the second waiver was premised on the COVID-19 pandemic. *Id.* Ortega unsuccessfully sought further extensions of his eligibility to compete in NCAA collegiate DI wrestling for Iowa State in 2023. Ortega Decl., ECF No. ¶¶ 13–16. Because Ortega enrolled in an institution of higher learning in 2016, after applying the two waivers his collegiate eligibility was deemed to have been exhausted after the spring semester of 2023. *Id.* ¶ 16.

The NCAA is a voluntary association of approximately 1,100 member schools which are organized into three divisions—DI, DII, and DIII. Vaughn Decl. ¶ 6, ECF No. 43-1. Five hundred thousand athletes compete across all three divisions in various sports. *Id.* ¶ 7. Division I consists of 350 member schools in which 180,000 athletes compete across twenty-six sports. *Id.* ¶ 10.

### B.    Procedural Background

On December 15, 2025, Ortega filed suit in this Court alleging the NCAA was in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, and seeking declaratory and injunctive relief against the NCAA. Compl. ¶ 1, ECF No. 1. On the same day, Ortega also moved for a temporary restraining order and preliminary injunction. Pl.'s Mot. TRO & Prelim. Inj., ECF No. 2. The Court denied the request for an ex parte temporary restraining order on December 18, 2025, and prepared to expedite

2

addressing the motion for a preliminary injunction. Order Den. Pl.'s Mot. TRO, ECF No. 4. Ortega then voluntarily withdrew his motion for a preliminary injunction. Pl.'s Mot. Withdraw Mot. Prelim. Inj., ECF No. 18.

The NCAA filed a motion to dismiss on February 9, 2026. Def.'s Mot. Dismiss, ECF No. 24. After consultation with the parties, the Court set a hearing on the NCAA's motion to dismiss for April 10, 2026. Scheduling Order, ECF No. 27. On March 6, 2026, Ortega filed this renewed motion for a preliminary injunction and requested expedited relief. Pl.'s Renewed Mot. Prelim. Inj., ECF No. 34; Pl.'s Br. Supp. Renewed Mot. Prelim. Inj., ECF No. 34-1. The NCAA filed a response and Ortega replied. Def.'s Resp. Pl.'s Renewed Mot. Prelim. Inj. ECF No. 35; Pl.'s Reply Supp. Renewed Mot. Prelim. Inj., ECF No. 38. The Court denied expedited relief, Order, ECF No. 41, and set the preliminary injunction hearing to coincide with the previously scheduled motion to dismiss hearing on April 10, 2026. Scheduling Order, ECF No. 49; ECF No. 66.

Ortega offered seven exhibits and offered the live testimony of two witnesses—himself and Iowa State wrestling coach Kevin Dresser—in support of his motion for a preliminary injunction. Pl.'s Witness and Exhibit List, ECF No. 53. The NCAA offered six exhibits and an affidavit from Jerry Vaughn, a managing director of Division I governance and member services, in opposition to Ortega's motion. Def.'s Am. Ex. List, ECF No. 65; Vaughn Decl., ECF No. 43-1. The Court admitted all exhibits without objection. ECF No. 66. While a transcript is not available for the live testimony, the Court recalls the testimony and relies on the facts presented in the testimony as set forth below.

For the reasons explained below, the Court denies Ortega's request for a preliminary injunction.

## III.    LEGAL STANDARD

"The party seeking a preliminary injunction bears the burden of establishing the necessity

of this equitable remedy." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 316 (8th Cir. 2009). To decide if a movant satisfies this burden, the Court considers the four *Dataphase* factors: "(1) the threat of irreparable harm to the moving party; (2) the weight of this harm as compared to any injury an injunction would inflict on other interested parties; (3) the probability that the moving party will succeed on the merits; and (4) the public interest." *Id.* (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)). The *Dataphase* factors are not applied as a "rigid formula." *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999). "No single factor in itself is dispositive; in each case all the factors must be considered to determine whether on balance they weigh towards granting the injunction." *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987). Ultimately, the Court "has broad discretion when ruling on requests for preliminary injunctions." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998).

## IV.    DISCUSSION

Ortega seeks a preliminary injunction enjoining the NCAA from enforcing the five-year eligibility rule which, if enforced against him, would prohibit him from competing in the 2026 and 2027 collegiate wresting seasons. ECF No. 34. The Court addresses each of the *Dataphase* factors in turn, beginning with the most important—Ortega's likelihood of success on the merits in showing the NCAA has violated § 1 of the Sherman Act.

### A.    Likelihood of Success on the Merits

Although "'no single factor is determinative,'" likelihood of success on the merits is "the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (quoting *Dataphase*, 640 F.2d at 113). To determine the likelihood of success on the merits, the Court assesses whether the plaintiff has a "fair chance" of prevailing. *Planned Parenthood v. Rounds*, 530 F.3d 724, 732–33 (8th Cir. 2008) (en banc). In doing so, "a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant

4

that justice requires the court to intervene to preserve the status quo." *United Indus.*, 140 F.3d at 1179 (quoting *Calvin Klein Cosmetics*, 815 F.2d at 503).

Ortega challenges the five-year eligibility rule, alleging it is an unreasonable restraint on trade under § 1 of the Sherman Act. ECF No. 34 ¶ 1. The Sherman Act prohibits "'contract[s], combination[s], or conspirac[ies] in restraint of trade or commerce.'" *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 80 (2021) (quoting 15 U.S.C. § 1) (alterations in original). The Supreme Court has long recognized "restraint of trade" means "undue restraint." *Id.* (quoting *Ohio v. American Express Co.*, 585 U.S. 529, 540 (2018) (internal quotation marks omitted)). Section 1 therefore "outlaw[s] only *unreasonable* restraints." *American Express Co.*, 585 U.S. at 540 (quoting *State Oil Co. v. Khan,* 522 U.S. 3, 10 (1997)) (emphasis in original). While certain horizontal restraints may be deemed unreasonable per se, the vast majority of restraints are "judged under the rule of reason." *Id.* at 541 (internal quotation marks and citation omitted). "The rule of reason requires courts to conduct a fact-specific assessment of 'market power and market structure . . . to assess the [restraint]'s actual effect' on competition." *Id.* (quoting *Copperweld Corp. v. Indep. Tube Corp.,* 467 U.S. 752, 768 (1984)) (alterations in original). The Court must "distinguis[h] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Id.* (quoting *Leegin Creative Leather Products, Inc. v. PSKS, Inc.,* 551 U.S. 877, 886 (2007)) (alteration in original) (internal quotation marks omitted).

The rule of reason employs a three-step burden-shifting framework. *Alston*, 594 U.S. at 96. Under this framework, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect," then "the burden [] shifts to the defendant to show a procompetitive rationale for the restraint," lastly, if the defendant successfully shows a procompetitive rationale, "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.*

at 96–97 (internal quotation marks and citation omitted).

Rule of reason analysis requires "'an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint' to ensure that it unduly harms competition before a court declares it unlawful." *Id.* at 97 (quoting *California Dental Ass'n v. FTC*, 526 U.S. 756, 781 (1999)). The Supreme Court has warned "[t]hese three steps do not represent a rote checklist, nor may they be employed as an inflexible substitute for careful analysis," and "what is required to assess whether a challenged restraint harms competition can vary depending on the circumstances." *Id.*

The commercial and legal landscape of collegiate athletics has changed significantly in recent years—beginning with the Supreme Court's landmark decision in *Alston*. In *Alston*, the Supreme Court found the NCAA's bylaws limiting education-related benefits for student-athletes violated § 1 of the Sherman Act. *Id.* at 106. The Court highlighted the explosion of money in collegiate athletics and warned courts must be sensitive to changes in market realities, stating "[i]f those market realities change, so may the legal analysis." *Id.* at 93. In rejecting the NCAA's appeal to amateurism as a blanket immunity from antitrust scrutiny, the Court noted "there can be little doubt that the market realities have changed significantly" since the Court decided earlier NCAA cases decades prior. *Id.* By 2021, the Court noted "the NCAA has become a sprawling enterprise" comprised of "about 1,100 colleges and universities, organized into three divisions," and "[a]t the center of this thicket of associations and rules sits a massive business." *Id.* at 79.

Justice Kavanaugh's prescient concurrence in *Alston* observed "[i]f it turns out that some or all of the NCAA's remaining compensation rules violate the antitrust laws, some difficult policy and practical questions would undoubtedly ensue." *Id.* at 111 (Kavanaugh, J., concurring). In just the few years since *Alston*, collegiate athletics has continued to undergo radical transformation—spurred on by the barrage of antitrust challenges Justice Kavanaugh foresaw arising from the Court's otherwise narrow ruling in *Alston*.

6

Following *Alston*, the NCAA largely continued to prohibit athletes from receiving direct payment from member institutions. This blanket prohibition changed on July 1, 2025, as a result of a settlement in *In re College Athlete NIL Litigation*, which was a consolidation of several antitrust cases including *Grant House v. Nat'l Collegiate Athletic Ass'n*, 545 F. Supp. 3d 804 (N.D. Cal. 2021). *In re Coll. Athlete NIL Litig. (House)*, 803 F. Supp. 3d 959 (N.D. Cal. 2025). As part of the *House* settlement, the NCAA agreed to amend its rules and permit direct payment to student athletes by member institutions through a revenue sharing model. *In Re NIL*, 803 F. Supp. 3d at 975. The settlement allows Division I schools to pay up to an estimated $20 million "in the 2025-26 school year and grow[s] to $32.9 million per school in 2034-35." *Id.* This settlement permits schools to spend in estimation "at least $19.4 billion for the 10-year period." *Id.* The Court is cognizant of how these rapidly changing market realities affects the rule of reason analysis. *See Alston*, 594 U.S. at 93.

### 1.     The Five-Year Rule is Commercial

The Court first addresses whether the five-year rule is commercial in nature such that it is subject to antitrust scrutiny. In determining whether a rule is commercial or not, "[t]he dispositive inquiry . . . is whether the rule itself is commercial, not whether the entity promulgating the rule is commercial." *Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, 388 F.3d 955, 959 (6th Cir. 2004). Rule 12.6.1, titled the "Five-Year Rule" states "[a] student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution." Pl.'s Ex. 2 at 57, ECF No. 1-3.

Some courts have found the five-year rule to be non-commercial and therefore not subject to antitrust analysis. *See, e.g.*, *Hasz v. Nat'l Collegiate Athletic Ass'n*, No. 8:25-CV-398, 2025 WL 2083853 (D. Neb. July 24, 2025); *Coley v. Nat'l Collegiate Athletic Ass'n*, 792 F. Supp. 3d 634 (E.D.N.C. 2025). While there was a time where NCAA eligibility rules for unpaid

student-athletes could reasonably be considered non-commercial, the current era of NIL and multi-million-dollar direct payments to athletes has rendered such an interpretation moot. The current collegiate sports market is a labor market competing for the paid services of athletes.

This Court agrees with the growing number of courts, including all three circuit courts which have confronted the issue to date, in finding the lucrative financial benefits available under the new commercialized model of collegiate athletics—including direct payments permitted as of July 1, 2025—renders eligibility rules which restrict the ability of athletes to compete in the labor market to be commercial in nature and subject to antitrust review. *See, e.g., Elad v. Nat'l Collegiate Athletic Ass'n*, 160 F.4th 407, 414–15 (3d Cir. 2025); *Fourqurean v. Nat'l Collegiate Athletic Ass'n*, 143 F.4th 859, 864 (7th Cir. 2025); *Robinson v. Nat'l Collegiate Athletic Ass'n*, No. 25-2003, 2026 WL 914055, at *8 (4th Cir. Apr. 3, 2026); *Braham v. Nat'l Collegiate Athletic Ass'n*, 794 F. Supp. 3d 824, 833 (D. Nev. 2025) (finding "in a post-*Alston* world of NIL compensation and changed 'market realities,' . . . classification of NCAA eligibility rules as 'noncommercial,' is rendered moot."); *Pavia v. Nat'l Collegiate Athletic Ass'n*, 760 F. Supp. 3d 527, 540 (M.D. Tenn. 2024) (highlighting the "new economic reality in the age of NIL compensation"). Exempting eligibility rules from antitrust scrutiny without considering the specific commercial effects of such rules is untenable given "the NCAA's ability to reframe even compensation rules as eligibility rules." *Elad*, 160 F.4th at 415.

The facts present in this case further reinforce the commercial nature of the five-year rule. Iowa State has made $1 million of its revenue sharing funds available for its wrestling team. ECF No. 34-1 at 15. The five-year rule is directly prohibiting Ortega from receiving compensation for the wrestling labor he wishes to provide for Iowa State, and for which Iowa State wishes to compensate him. *Id.* at 15. The Supreme Court has long recognized that restraints on labor through association rulemaking which "would unduly interfere with the free exercise of the[] rights by those engaged, or who wish to engage, in trade and commerce" are subject to antitrust scrutiny.

8

*Anderson v. Shipowners' Ass'n of Pac. Coast,* 272 U.S. 359, 362–63 (1926) (quoting *United States v. Colgate & Co.,* 250 U.S. 300, 307 (1919)). "Moreover, and most importantly, the Court further rejects the notion that the product that the NCAA is offering—competitive college athletic sports events—is unique because the athletes are unpaid amateurs. They are not. This is now a labor market with compensated workers." *Martinson v. Nat'l Collegiate Athletic Ass'n,* 804 F. Supp. 3d 1109, 1125 (D. Nev. 2025). The Court agrees. Because the five-year rule is commercial in nature, the Court proceeds to conduct a rule of reason analysis.

### 2.    Market Definition and Anticompetitive Effects

Having determined the five-year rule is subject to a rule of reason inquiry, the Court begins with whether Ortega has met his burden to show the NCAA "(1) participated in an agreement that (2) unreasonably restrain[s] trade in the relevant market." *Pavia,* 760 F. Supp. 3d at 536 (internal quotation marks and citation omitted) (alteration in original). Ortega may prove anticompetitive effects either through direct or indirect evidence. *Cf. American Express Co.,* 585 U.S. at 543. Direct evidence of anticompetitive effects includes "proof of actual detrimental effects [on competition], such as a reduction of output." *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 460 (1986). Indirect evidence of anticompetitive effects includes "proof of market power plus some evidence that the challenged restraint harms competition." *American Express Co.,* 585 U.S. at 543.

### a.    Relevant market definition

Necessary to determining whether Ortega has made a showing of anticompetitive effects is defining the relevant market because "[w]ithout a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition." *Id.* (quoting *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 177 (1965)) (second and third alterations in original). "[T]he relevant market is defined as the area of effective competition." *Id.* (internal quotation marks and citation omitted). "[T]his is the 'arena within which significant substitution

in consumption or production occurs.'" *Id.* (quoting P. Areeda & H. Hovenkamp, *Fundamentals of Antitrust Law* § 5.02 (4th ed. 2017)). However, "courts should combin[e] different products or services into a single market when that combination reflects commercial realities." *Id.* (internal quotation marks and citation omitted) (alteration in original).

"[C]ourts hesitate to grant motions to dismiss for failure to plead a relevant . . . market because market definition is a deeply fact-intensive inquiry." *Fourqurean*, 143 F.4th at 870 (internal quotation marks and citation omitted) (second alteration in original). "The preliminary injunction inquiry, however, is a 'decidedly far more searching inquiry than the question of whether a complaint properly alleges a claim for relief.'" *Id.* (quoting *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123, 134 (D.C. Cir. 2020)). The Court therefore proceeds to consider whether, based on the evidence presently in the record, Ortega is likely to prevail in defining a relevant market.

Ortega's complaint seemingly alleges both that NCAA DI athletics overall is a relevant market, and that specifically DI wrestling is a relevant market. ECF No. 1 ¶¶ 44, 48. At oral argument, Ortega indicated there are several potentially relevant markets, but the complaint and allegation of anticompetitive effects therein are primarily alleged in the distinct labor submarket of NCAA DI wrestling. ECF No. 66. The Court therefore focuses on whether Ortega is likely to succeed in showing anticompetitive effects in the distinct submarket of DI wrestlers.

In support of his proposed market definition, Ortega offers a declaration from B. David Ridpath. Ridpath Decl., ECF No. 34-3. This declaration offers no economic analysis of current market conditions, nor does it provide support for its assertions regarding the relevant market at issue in this case. Therefore, while the Court considers the factual assertions contained within the declaration, the Court gives little weight to the conclusory claims regarding the relevant market and the anticompetitive effects therein.

The Court first addresses whether folkstyle wrestlers offer a distinct labor product, separate

from Olympic-style or freestyle wrestling. Ortega presented facts relevant to the market analysis through the testimony of Iowa State wrestling coach Kevin Dresser.[1] ECF No. 66. Dresser testified to the various different styles of wrestling and which styles are permitted in various competitions. He stated folkstyle wrestling exists only in the United States, is the only style offered in the NCAA, and is distinct from Olympic-style or freestyle wrestling. Dresser testified that wrestlers do not have any other opportunities to folkstyle wrestle after their NCAA eligibility ends—they must instead transition to freestyle wrestling. Dresser described some differences between the styles and stated some wrestlers struggle to adapt while others perform well at both. Dresser stated the skill a wrestler has with one style is usually similar to the skill the wrestler has competing in the other style. Dresser stated he has recruited freestyle wrestlers to compete in DI folkstyle wrestling. Both the relative similarity in activity, and the fact that wrestlers in one style have been recruited to compete in the other style, indicate a degree of substitutability in the labor market for wrestlers as between folkstyle and freestyle wrestlers. From the facts presented, the Court concludes there appears to be a sufficient degree of competition and interchangeability between folkstyle and freestyle wrestlers, such that any relevant labor market must include them both.

The Court next turns to whether the record establishes that any other employers compete for the labor services of these wrestlers, or if the NCAA is the sole employer in the relevant labor market such that it exercises monopsony power in the market. Ortega and Dresser both testified to the significant financial opportunities available to wrestlers who compete in NCAA DI athletics. This includes both revenue-sharing payments as a result of the *House* settlement, and NIL opportunities. Ortega testified regarding several tournaments he participated in while training as

---

[1] The Court takes judicial notice that Kevin Dresser has since been named the Director of Men's and Women's Wrestling at Iowa State as of April 16, 2026. *Kevin Dresser Named ISU'S Director of Men's and Women's Wrestling*, Iowa State University (April 16, 2026), https://cyclones.com/news/2026/4/16/kevin-dresser-named-isus-director-of-mens-and-womens-wrestling; *cf. Am. Prairie Const. Co. v. Hoich*, 560 F.3d 780, 798 (8th Cir. 2009) (permitting courts to take judicial notice of facts of common knowledge or capable of verification).

an Olympic athlete in Cuba, as well as the financial support he received for doing so. He stated many of these tournaments did not pay prize money and the ones which did were not of significant value. Ortega also testified he received approximately fifty dollars a month from the Cuban government while training for the Olympics. In contract, Dresser testified to the significant financial sums available to NCAA DI wrestlers. Dresser stated each NCAA DI member is allowed to allocate $20.5 million which they may allocate among their different athletic programs to directly compensate athletes.[2] From this, Iowa State has made $1 million available to pay wrestlers.

In weighing the evidence presented by Ortega in support of his motion for a preliminary injunction, the Court notes Dresser relayed both facts to which he would have firsthand knowledge of due to his experience as head coach, as well as relaying speculation regarding the current state of DI wrestler compensation throughout the country for which he offered no foundation. The Court affords little weight to the latter. Dresser stated he believes Iowa State is one of approximately five schools which have allocated at least $1 million to compensate wrestlers. Dresser testified two wrestlers at Iowa State were paid $125,000 each in 2025. Dresser testified that he speculates accomplished wrestlers will likely demand at least $200,000 in 2026. Dresser further testified that in addition to direct revenue-sharing payments, wrestlers will receive NIL payments. Dresser testified he does not believe Division II and III athletes, nor NAIA athletes, have comparable financial opportunities. However, Dresser also testified as to rumors that one wrestler in a lower division received a sizable payment several years ago. Dresser speculated he believed the highest paid DI wrestler received $1 million. Given the speculative nature of much of the testimony and lack of articulable foundation for the payment figures and revenue-sharing budgets for other

---

[2] The Court notes that while such direct competition between the athletes of these various athletic programs for the same finite share of revenue-sharing funds indicates a relevant market may be the labor market for DI athletics overall, Ortega focuses his claim on wrestling specifically and did not offer further evidence regarding this potential market.

schools, the Court lacks the facts necessary to determine the contours of the relevant market with any definite certainty.

Ortega further presented no economic data or analysis which would permit the Court to establish a relevant market. The Court does not know how many schools allocate a portion of their *House* revenue-sharing budget to their wrestling program, what percentage of wrestlers receive revenue-sharing payments, what the average payment amount is, the concentration of payments, or other information necessary to establish a relevant market based on an economic analysis. *Cf. Alston*, 594 U.S. at 90.

Additionally, if Dresser's testimony that only five schools allocate at least $1 million to wrestling and competitive wresters at these schools each demand over $200,000 is proven accurate, there may exist a further distinct submarket of only those DI programs with large wrestling budgets. These asserted facts suggest most DI programs may compete more directly with DII and DIII schools which collectively spend much less on wrestling than the five DI wrestling-focused schools. The select few wrestlers who command such high payment would likely not view DI programs with little to no revenue-sharing budget as substitutable with the handful of DI programs which do offer significant revenue-sharing payments for wrestlers. Because, based on the evidence presented, the Court cannot determine the "reasonable interchangeability" of employers for collegiate wrestling services or the "cross-elasticity of demand between" schools with large and small or nonexistent revenue-sharing budgets, the Court cannot determine the "outer boundaries" of the relevant labor market. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). While Ortega likely makes out a prima facia showing of a relevant market, Ortega has failed the "decidedly far more searching inquiry" needed to show he is likely to succeed on the merits in defining a relevant market. *Fourqurean*, 143 F.4th at 870.

The Court briefly addresses the evidence regarding the relevant geographic market. Both Ortega's and Dresser's testimony indicate there is no foreign opportunity to earn significant money

competing in wrestling. It is therefore likely Ortega will be able to prevail in showing the relevant geographic market to be the United States because this is the area in which the NCAA operates and therefore where revenue-sharing and NIL opportunities are available. However, Ortega did not put forth any facts regarding foreign wrestling competitors apart from his own experience. Such a limited record is likely insufficient on its own to establish the relevant geographic market, particularly in light of the testimony supporting the substitutability of freestyle and folkstyle wrestling.

b.    Anticompetitive effects

The failure to adequately define the market is sufficient to show Ortega is unlikely to succeed on the merits of the § 1 claim. Nevertheless, the Court briefly addresses whether Ortega has adequately shown anticompetitive effects in his claimed relevant market. Ortega asserts the five-year rule "substantially restrains competition in the market for NCAA Division I wrestlers by preventing Ortega and similarly situated athletes—who enrolled in college but did not compete in wrestling—from later using four full seasons of Division I eligibility to obtain scholarships, revenue-sharing compensation, and NIL opportunities." ECF No. 34-1 at 15. The Court notes Ortega did wrestle competitively while enrolled in college in Cuba, but competed as part of the Cuban national team and not for the college. Ortega Decl., ECF No. ¶¶ 7–9. The five-year rule does operate to prohibit NCAA member institutions from entering into labor contracts with an indeterminate subset of wrestlers who those institutions would otherwise seek to employ. Therefore, direct evidence exists that the five-year rule has detrimental economic effects on all wrestlers the five-year rule excludes from the wrestling labor market.

Ortega, however, fails to show the magnitude of the anticompetitive effects because he fails to adequately demonstrate the scope of the labor market for wrestling. The effects in a market which consists of only those five schools identified by Dresser with significant wrestling budgets will be different than if all DI schools can effectively compete for the labor services of wrestlers.

14

This is because demand for wrestling services is a function of which schools are positioned to pay for wrestlers. Because the Court does not know what the demand for wrestling services is in the relevant market, it cannot measure the anticompetitive harms associated with a reduction in the supply of wrestlers caused by the five-year rule excluding wrestlers such as Ortega. Ortega therefore fails to show a likelihood of success on the merits as to the anticompetitive effects of the five-year rule.

### 3.    Procompetitive Justifications

Even if Ortega was likely to succeed in meeting his burden to show a relevant market and anticompetitive effects therein, the NCAA can still prevail by showing "a procompetitive rationale for the restraint" in step two of the rule of reason analysis. *American Express Co.*, 585 U.S. at 541. Procompetitive justifications include "enhanced consumer appeal." *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) (discussing procompetitive effects under the identical § 2 rule of reason analysis).

Critically, while myriad social benefits likely accrue by requiring NCAA athletes to attain an education and move along to other endeavors as opposed to treating an NCAA athletic career as a substitute for other professional endeavors, antitrust law does not "consider whether this restraint of trade serve[s] some social good more important than competition." *Alston*, 594 U.S. at 95. The Court cannot, and does not, consider the social benefits which derive from promoting academics. The Court focuses on whether the NCAA has shown an economically relevant procompetitive justification for the restraint on trade such that Ortega is not likely to ultimately succeed on the merits of his § 1 claim.

The NCAA asserts the five-year rule "create[s] and preserv[es] college athletics as a unique offering from professional sports." ECF No. 43 at 22. The rule "goes to the crux of what it means to be a student-athlete and [is] therefore essential to the very existence of the product of college wrestling." *Id.* at 23. The NCAA argues the rule is necessary "to ensure that collegiate sporting

events continue to attract the interests of consumers/fans." *Id.* In support, the NCAA offers the declaration of Jerry Vaughn, the managing director of Division I governance and member services at the NCAA. Vaughn Decl., ECF No. 43-1. Vaughn asserts "[t]he Five-Year Rule is motivated by the concept that the length of time a student is enrolled in undergraduate education should bear a relationship to the length of time that the student should be permitted to participate in intercollegiate athletics." *Id.* ¶ 19. Vaughn asserts "the Five-Year Rule defines 'collegiate institution' broadly to include . . . foreign institutions of higher education . . . to ensure collegiate athletics are played roughly between peers, meaning those students who had roughly similar opportunities after high school to train and compete as athletes." *Id.* ¶ 21. Vaughn states the rule "serves an important purpose in protecting the viability of collegiate sports and teams so that collegiate sports remain attractive to consumers/fans." *Id.* ¶ 24. Vaught claims consumers value this rough age parity, stating "[c]ollegiate athletics remain popular in part due to the non-professional nature of athletic competition and some level of competitive balance." *Id.* The NCAA asserts this rough age parity is key to fan enjoyment because "[f]ans of NCAA athletics appropriately expect that the student-athletes those fans see in competition will have had approximately the same period of opportunity to develop their athletic skill." *Id.* ¶ 22.

To show a likelihood of success on the merits, Ortega must show the NCAA is unlikely to be able to ultimately show the procompetitive effects of the five-year rule outweigh the anticompetitive effects alleged above. The alleged procompetitive effects of the five-year rule go to the heart of the product the NCAA offers and, therefore, the reason NCAA athletics generates such significant revenue and financial opportunities for athletes. During arguments Ortega argued, post *Alston* and the approval of the *House* settlement, the NCAA is essentially in the business of providing a professional sports product and employing athletes to compete in professional sports. When asked whether the Court finding the five-year rule a violation of the Sherman Act would essentially render all or most NCAA eligibility rules unenforceable, Ortega conceded it

likely would. This is a significant disagreement between the parties, as professional sports is a fundamentally different product than the NCAA argues it offers. ECF No. 43 at 22–23. Critically, professional sports is a different product than the NCAA asserts its customers desire and seek out. The NCAA argues fans of collegiate athletics are less likely to consume the product if the Court strikes down the five-year rule. If the effect of striking down the five-year rule is a less valuable product which fewer consumers seek out, this harms both consumers who have lost a product of value, and the athletes employed in the labor market for the product.

In this case, a twenty-eight-year-old wrestler who began college in 2016 and competed professionally for years would be permitted to wrestle in the 2027 season against eighteen-year-olds. At this stage of the proceedings, the Court finds the record establishes it is plausible that consumers of collegiate athletics would find this product less desirable and therefore consume it less. Vaughn Decl., ECF No. 43-1 ¶¶ 21–24. Decreased product consumption would lead to less revenue and fewer NIL opportunities for all NCAA wrestlers as the total potential market would have shrunk. Because procompetitive and anticompetitive impacts are measured as to the market as a whole, not as to individual competitors within the market, a reduction in total available revenue harms all competitors within the market. While Ortega, and other athletes similarly situated, are harmed by exclusion from the labor market as a result of the five-year rule, this harm is likely smaller than the countervailing harm to all wrestlers losing revenue and NIL opportunities if the product of NCAA wrestling is consumed less by consumers.

If the NCAA ultimately demonstrates that consumers prefer a product which has rough age parity and a nexus to academics, the five-year rule is necessary to produce the product consumers desire and the rule therefore has procompetitive effects which outweigh the anticompetitive harms. The question of consumer preferences, and the impact such large changes to the product would have on the total market, are highly fact-intensive issues. At this early stage of litigation, and with the underdeveloped record before the Court, Ortega has not shown a likelihood of success in

showing the anticompetitive effects of the five-year rule outweigh the potential procompetitive benefits.

### 4.    Less Restrictive Means

The final step of the rule of reason analysis shifts the burden back to Ortega "to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *American Express Co.*, 585 U.S. at 542. The Supreme Court made clear in *Alston* that "antitrust law does not require businesses to use anything like the least restrictive means of achieving legitimate business purposes." 594 U.S. at 98. It warned such a requirement "would be a recipe for disaster, for a skilled lawyer will have little difficulty imagining possible less restrictive alternatives to most joint arrangements." *Id.* (internal quotation marks and citation omitted).

While Ortega puts forth several suggested alterations to the five-year rule which he asserts would achieve the NCAA's stated procompetitive justifications, none of these alterations are likely to meaningfully protect the differentiated product of wrestling competition with rough age parity and a nexus to academics. Indeed, it would likely be impossible for Ortega to plausibly set forth a less restrictive means of achieving this product while maintaining his own eligibility because a key product feature the NCAA argues consumers value is rough age parity. Any eligibility rule which protected such a product likely would, by necessity, exclude a twenty-eight-year-old from competing against an opponent a decade his junior. Ortega has therefore failed to show he is likely to succeed in showing a less restrictive means of achieving the procompetitive effects stemming from producing the differentiated product the NCAA provides to consumers.

Ortega has failed to show he is likely to succeed on the merits of his claim. The first *Dataphase* factor therefore leans strongly against granting his motion for a preliminary injunction.

### B.    Irreparable Harm

"To succeed in demonstrating a threat of irreparable harm, 'a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable

18

relief.'" *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (quoting *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996)). "The primary function of a preliminary injunction is to preserve the status quo until, upon final hearing, a court may grant full, effective relief." *Kansas City S. Transp. Co. v. Teamsters Local Union No. 41*, 126 F.3d 1059, 1066–67 (8th Cir. 1997) (internal quotation marks omitted) (quoting *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir. 1984)).

The Court agrees with many other courts which have found college athletes suffer irreparable harm when they are denied the opportunity to compete. *See, e.g., Ohio v. Nat'l Collegiate Athletic Ass'n*, 706 F. Supp. 3d 583, 599 (N.D. W.Va. 2023) (collecting cases); *Martinson*, 804 F. Supp. 3d at 1131; *Pavia*, 760 F. Supp. 3d at 544; *Braham*, 794 F. Supp. 3d at 838. Ortega has therefore demonstrated a threat of irreparable harm.

### C.   Balance of Harms

The Court next considers "the balance between th[e] harm [to the movant] and the injury that the injunction's issuance would inflict on other interested parties." *Pottgen v. Mo. State High Sch. Activities Ass'n*, 40 F.3d 926, 928 (8th Cir. 1994). This factor requires examining the harm granting or denying the injunction poses to all parties to the dispute, as well as other interested parties. *See Dataphase*, 640 F.2d at 113–14; *accord Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994).

The NCAA asserts "granting the relief that Plaintiff requests would adversely impact the decisions and collegiate careers of tens of thousands of student-athletes." ECF No. 43 at 26. This purported harm is speculative, and the NCAA has not shown a significant risk of such harm. The Court has only the power to grant or deny relief to Ortega, and such relief would not bind the NCAA to act with respect to any other athlete. *See Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). Ortega meanwhile stands to lose the opportunity to be compensated for his wrestling services and participate in the transfer portal. The balance of harms therefore tips towards Ortega.

19

*See Martinson*, 804 F. Supp. 3d at 1132.

### D.    Public Interest

Finally, the Court considers whether a preliminary injunction would serve the public interest. *Dataphase*, 640 F.2d at 113. Here, the public has only a limited interest in this private dispute between private parties. *See Katecho, Inc. v. Cont'l Mfg. Chemist, Inc.*, No. 4:18-cv-00314-RGE-CFB, 2018 WL 9814656, at *9 (S.D. Iowa Oct 16, 2018); *Reg Seneca, LLC v. Harden*, 938 F. Supp. 2d 852, 862 (S.D. Iowa 2013).

Courts have highlighted that "promoting free and fair competition in labor markets guaranteed by antitrust laws" serves the public interest. *Ohio*, 706 F. Supp. 3d at 600. As discussed above, Ortega has failed to show a likelihood of success in showing the five-year rule violates antitrust law. Therefore, the public interest factor is limited.

### E.    Application of the *Dataphase* Factors

The Court concludes by balancing the *Dataphase* factors. Ortega has shown a likelihood of irreparable harm absent an injunction, and has shown the balance of harms weighs in his favor. The public interest factor is limited in this case. However, Ortega has failed to show a likelihood of success on the merits of his § 1 claim. While "no single factor is determinative," likelihood of success on the merits is "the most significant." *Home Instead, Inc.*, 721 F.3d at 497 (citation omitted). The Court therefore finds the *Dataphase* factors weigh against granting Ortega's motion for a preliminary injunction.

## V.    CONCLUSION

For the reasons set forth above, the Court denies Ortega's motion.

Accordingly, **IT IS ORDERED** that Plaintiff Reineri Andreu Ortega's Motion for Preliminary Injunction, ECF No. 34, is **DENIED**.

**IT IS SO ORDERED**.

Dated this 23rd day of April, 2026.

REBECCA GOODGAME EBINGER
UNITED STATES DISTRICT JUDGE